Good morning, Your Honor. My name is Mahir Sharif and I represent Omar Abdi Mohammed. Your Honor, this case is before you on the issue of whether or not the appeal is moot and two, on whether or not the district court abused its discretion in granting a sixth-level upward departure on national security grounds and sentencing Mr. Mohammed to 18 months. Basically, the facts of the case are that Mr. Mohammed was arrested in January of 2004 and stayed in custody for approximately two years fighting his case and went through two trials. Initially, he was indicted on two counts about lying about having taken money from an organization that had subsequently been designated a global terrorist. Subsequently, the government superseded the indictment and added additional counts. At the first trial, he was acquitted of counts one and two, which were the more serious counts, and at the second trial, he was acquitted of the ninth count, which also was the more serious count. Had he been convicted of any of those three counts of which he was convicted, the enhancement perhaps would have been appropriate and — Sotomayor — of which he was acquitted. That's correct. You said convicted. Excuse me. I apologize. Of which he was acquitted. Perhaps the enhancements would have been appropriate, and the concrete and identifiable collateral effect would not have come into play. Here, Mr. Mohammed has family members here. He has six U.S. citizen children here. He has a wife who is a U.S. citizen. He has ties to this community. Had not Judge Houston sentenced him to a sentence over and above those 12 months, thereby making him an aggravated felony, he would — the United States government would not have been able to deport him because he had relief available to him. But once that threshold of 12 months is reached, that jumped him into aggravated felony category, whereby he chose to — to — to move on with his life and chose basically his own deportation. However, the — the court clearly made error in enhancing — in using facts that — for which he was acquitted in enhancing his sentence. The four factors that the court used — the fact about the money. The money at the time that Mr. Mohammed received the money, global relief, and al-Haramain were legally designated Islamic charities within the United States. Mr. Mohammed was in the business of charity. He didn't — he never denied that he received his — this money. In fact, Judge Houston — in my arguments to Judge Houston at the date of sentencing, I told Judge Houston, look, Judge Houston, at the second interview when Mr. Mohammed was not aware that he was being — he was going to be arrested at the end of the interview, when they asked him a straightforward question, have you ever received any money from Saudi Arabia? He said, yes. Have you ever — what did you receive? This much amount I was receiving. So Judge Houston used these factors that — that were not found by the jury to enhance the sentence. So the government is basically having it both ways. Like I've said in the — in the — in the — in the — in the argument in my — in my sentencing argument, basically what is happening here is the government is bringing before you a quote-unquote terrorism case, allegedly guised and — and — and covered under the statue of immigration, and wanting to have it both ways. And justice was not served in this case. Justice would have been served — the whole — the entire Somali community was out there watching this trial, and we have — this day and age, we have to perceive reasonableness because Judge Houston was not reasonable in light of the fact that he did not serve justice here. The sentence that probation recommended was six months. The sentence that the guidelines anticipated was six months. The sentence that should have been given was six months. Judge Houston tripled it to 18 months, thereby taking it and clearly stating on the record that even if he was in error, that under 3553, that he would have still given him the enhancement. However, he gives us no explanation as to what factors he considered, other than just conclusively saying, I've taken into account 3553. He never gives us any reasons as to what factors under 3553 that he took into account and what reasoning he put into it to reach the decision that he did. For those reasons, I think the Court should — Well, could you please address mootness and whether we should hold this case until the Supreme Court acts in the Toledo Flores case? Perhaps that is appropriate. Correct, Your Honor. But on the issue of mootness, Your Honor, my argument is that — Kathy? Go ahead. My argument is, Your Honor, that there is an identifiable collateral effect that affects my client here, Mr. Muhammad. And because of that, the — it is not as if he doesn't have relief. He has a need to be here. He has a family. He has children. He has a wife. So they are not moot to him. However, you have cited a case. Perhaps you're more familiar with that case than I am, Judge. And if you feel that that's what we should do — The case of Sir Shirari and where the person involved had been deported and mootness was briefed, it has some parallels is all. So I wondered if we should wait, see if they said the case wasn't moot. Go ahead. Thank you, Judge, for bringing that to my attention. If, in fact, that issue is on appeal with the Supreme Court, and the court, this court, is honing in on that issue, I think it would be the right thing perhaps to wait until the Supreme Court's rules on that issue because it could decide this case one way or the other. Well, he's still subject to supervision. That is correct. But we have not — he's out of the country right now. So that issue is — but, yeah, he was given three-year supervised release, and he is subject to supervision. That's correct, Your Honor. And he certainly has a viable interest in reducing his sentence to make the conviction look less severe and increase his chances of getting a discretionary waiver of reentry. That's correct, Your Honor. And I believe that is similar to the case in — Now, what — tell me again. What facts did the district judge base the sentence on? Well — That an earlier jury had found had not been proved? Beyond a reasonable doubt. Basically, the two counts that were initially indicted was — the facts were that the government claimed that at the time that he was interviewed for his naturalization, that he lied about having received money from two Islamic charities. One is called Global Relief, from which he took in excess of $360,000, and one is called Al-Haramain, from which he took $5,000. At the time that he had actually taken this money, funneled it through a bank account in San Diego, Union Bank of California, and sent that money to Somalia, these organizations, these charities, were working — it was prior to 9-11, and they were working legally within the United States. And he had an organization called Western Somali Relief Organization, which was established for the purposes of charity, that had actually channeled this money to charity into Somalia. Well, after 9-11, when the government started looking at these organizations, we're stating that when they looked at the bank accounts, they saw these checks coming to Omar Muhammad. So what did they do? Most naturalization interviews are not conducted where you're videotaped. So they brought Omar in, and they videotaped him, and they said, okay, let's ask him some questions. Well, they brought these two-count indictments, initially, for which he was acquitted, because the jury found that no, Mr. Muhammad did not lie about the receipt of these monies. You never asked him a clear question. So this is the issue regarding the money now. Judge Houston says, well, even though you were acquitted of that, I still have to take into account that you received that money and that you have not accounted for that money. And clearly, that puts the Mr. Muhammad did not testify. Mr. Muhammad chose to exercise his right to remain silent. Judge Houston gave us no reason, no facts. There's no facts in the record, and Judge Houston gave us no reason as to what he thinks happened to this money. The government produced not a scintilla of evidence as to the fact that this money may have somehow ended up in some nefarious hands. They had no evidence that nobody knows. So that's the basis upon which the money part that Judge Houston enhanced. The second factor is he's stating that, well, you took money from organizations that were subsequently designated as being global terrorists. And that is true. Mr. Muhammad never denied it, but he never took into account that at the time that Mr. Muhammad took the money, these organizations were licensed. They were working in the United States. If that was the case, does that make all these Muslims who have contributed to these organizations somehow supporting terrorism too? It does not. So the logic isn't there. Mr. Muhammad did not take any money from these organizations after they were designated. The third one was the employment relationship with the Saudi government. Mr. Muhammad was receiving a stipend. We claim Mr. Muhammad says it's a stipend. It was $1,700 a month that he'd been receiving for approximately 20 years. We know that the Saudi government has over 3,000 propagators throughout the world that it pays money to to propagate Islam. And that's what he was doing. When he was asked at the second interview, the first interview he was never asked, when he was asked at the second interview, have you ever received any money from Saudi Arabia? He said yes. Judge Houston took that into account and he said, well, there's something more to your relationship with Saudi Arabia. But there was nothing in the record to indicate that there's anything but this relationship of being a propagator in regards to Saudi Arabia. So these are the three factors. The fourth factor is... What do you mean by a propagator? Meaning somebody who preaches Islam, somebody who tries to tell you about Islam and converts you, excuse me, to Islam. So that was his job. The fourth factor is world travel. Judge Houston... There was evidence that he had a mistress, Mr. Muhammad. There was evidence that he had a mistress in Australia. There was evidence that he traveled there back and forth within the last two years of his being in the United States. And he took the... And there was evidence that at a time, one or two times he had traveled to Saudi Arabia. And so Judge Houston took that, took all these factors together and said, based upon these factors, I'm going to enhance upwards. But he never gave us any reason. I mean, he never explained how, what the travel was for anything but legal activity. The record is clear that he had a wife and he had a child in Australia and that's where he was going. And when he was interviewed, he said so. The jury did convict him of having lied about the fact that he didn't have this child in Australia. However, as we argued in a trial, perhaps it was the way that the question was versed. But basically, all of these factors do not take this case outside of the heartland of cases. Okay. Well, we'll hear from the government. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. My name is John Parmley. I'm an assistant U.S. attorney in San Diego. And I'd like to address the two issues that were raised in this case. I'd first like to start with the mootness issue. There is no tangible controversy for this court to engage itself in. There's no benefit that the defendant is seeking other than pure speculation that would cause this court to exercise jurisdiction. Basically, what we have is somebody who received an 18-month sentence. And the tangible harm that he's alleging is that if in the future at some point, he applies to come back on a visa, that if he does that, the United States can bar him because he's an aggravated felon. However, he's entitled to, under certain circumstances, a discretionary relief. So the Attorney General may grant the visa. And one of the factors that the Attorney General could consider would be the length of his sentence. The United States is of the opinion that that is far too attenuated of a controversy for this court to consider. And it is closer to the case in the Spencer case, the Supreme Court case, where it was a parole revocation proceeding, where the idea that the fact that you had been violated before and the length of your sentence in your prior parole violation could ultimately affect a future parole revocation. The court said that's just not enough. Well, isn't he under some term? What about, counsel, what about... I'm sorry. Were you... No, go ahead. What about... Should I go now? Sure, please. My question is this. My question, what about the fact that he remains subject to terms of supervised release if he were to re-enter the U.S.? And he has kids here. He might re-enter the U.S. So wouldn't those terms then apply and doesn't the continuing existence of an order that would invoke those terms give us jurisdiction? My response to that is that, yes, that he is under a term of supervised release, that his supervision was waived. But if he were to return, he would be ordered to be supervised. But that wasn't advanced. That argument was not advanced, and that was not the burden is on the defendant to argue in a case where his sentence... This is not an appeal of his conviction. This is merely an appeal of the length of his sentence where no collateral consequences are presumed. If he doesn't advance that argument as his tangible benefit, I don't believe it's the court's position to step in and say, well, what about this one too? Well, it was covered in the government's brief, so briefing on it was presented to us. Well, I recognized, you know, that it was a possible issue and I put it out there. So maybe that was... I should have just ignored it. I'm sorry, go ahead. I don't know. Possibly, but the point is, since you did cover it, are we at liberty to rely on it? I think if it wasn't advanced by the defendant, then the court should not consider it. If that's not the tangible benefit he's asking for. Okay, what about the Toledo Flores case, where it's my understanding that the Supreme Court has granted cert in a case that has some factual parallels and that mootness was briefed and argued in that case. I wouldn't have any objection for this court to wait until further direction in the mootness area from the Supreme Court. I wouldn't have any objection to that. I think that the court, based on the Spencer case, could exercise... could find that there's no jurisdiction here, but I would have no objection to the court waiting, if that's the question. The other thing I want to point out, Your Honor, is as far as the mootness issue, there's also a practical aspect to this. The argument that's being advanced is not... which was not argued in the brief, this idea that he was an aggravated felon and should have gotten less of a sentence. The argument that's being advanced in the brief is that the length of a sentence could be a factor. The reality is, is what's more likely to be a factor in whether or not he's ever granted a visa? The fact that he worked surreptitiously for a foreign government, the fact that he received money from organizations that were later designated as... designated global terrorists, the fact that the Classified Information Procedures Act was invoked during his case, and the fact that his lies were about immigration. The fact of the practical matter is, he would never get a visa, and it's a more reasonable assertion that he would be placed on the no-fly list. This is not somebody who's got a drug conviction, that we can kind of say, well, maybe if you've got an 18-month sentence on a drug case or a 30-month sentence or a 6-month sentence, this is a person who repeatedly lied in the immigration process. I don't know how much the court should extend that and try and anticipate what the attorney general would do in making his decisions, but it seems to me that the length of the sentence, which is what's being argued, that the sentence should be shorter, has really almost no impact on whether or not he would ever get discretionary relief and get a visa. As far as the sentencing issue is concerned, I'd like to clear up a few things. There was no national security departure. There was no terrorism departure. We were not trying to hide this case as a terrorism case and cloak it as an immigration case. It was charged as an immigration case. There were certain factors that lent itself to have the court to have some questions. But the court in this case looked at a combination of factors and said, this is not a zero-to-six-month case. This is not the heartland of immigration fraud cases. The court sits in the Southern District of California, on the border of San Diego, in Mexico, and sees the heartland of immigration cases, people who lie on one question in a passport application, people who use a false document, people who lie about, you know, whether or not they have a criminal history or not. In this particular case, it was much more than that. You had an individual who lied to get here, who claimed to be working at a mosque that he never worked for. That was significant because that was the only way he got into this country. We learned over the course of the trial that he got a religious worker's visa, which is an unusual visa, which, once you have it, once you set foot in the country with the intent to work at a particular religious institution, you immediately get legal permanent residence status, even if the job doesn't exist anymore. We learned that he never worked a day there, but continued to claim in his naturalization application that he'd worked there for two years. We learned that he was working for the Saudi government as an employee. He claimed at the trial that he was merely a propagator, merely a missionary, merely engaged in religious work. The jury found otherwise. The jury found that he was an employee and that he lied when he failed to state that specifically on his application when he was asked about his employers. He was getting about $1,500 a month from a foreign government. He was asked to gather information, much of it religious in nature, some of it not, about demographics, about converts, about how to spend the kingdom's money, the kingdom of Saudi Arabia, things of that nature. You also had the fact that although it's true that he was acquitted of the charges that he lied about his association with the Western Somali Relief Agency, the court made it extremely clear that the facts underlying it were undisputed. And let me give you really what the problem was in that particular account. The defendant was asked, he was the founder, the president of the Western Somali Relief Agency. They received a lot of money from two organizations which were later designated, especially designated global terrorists, Al Haramain and Global Relief. While he was asked questions about it during his naturalization interview, he was asked about the Western Somali Relief Agency. He was asked questions like, well, you know, what did you do? Well, we tried to get some money to get to Somalia, but we could never get it off the ground. We didn't have enough money to send two boxes of blankets to Somalia. When, as we later learned out, he had received all this money from these two organizations. Unfortunately, the questions that were asked in the interview were compound, were confusing, and it was never clear to the jury, apparently, how he was answering that question, whether he was saying, now we have no money, or then we had no money. But what was undisputed and what the court took into consideration as to one of the things it would use to enhance his sentence was the fact that he had received all this money. He had received over $300,000 from these two organizations. It had gone out of his hands, churned through his bank account overseas, not through wire transfers or personal checks, through hawalas or informal money transfer systems, and there really was no records kept of what it went for. It may very well have gone for benevolent purposes, but the court was concerned that it is impossible to know what it was used for. So the court considered the fact that he had received all these monies from organizations that were later designated as linked to terrorism, the fact that he had worked surreptitiously for 10 years for a foreign government, which we have an unusual relationship with, that he hid that income, he hid that employment, and he was working for them, that he was a stated salary of $7,000 a year. If you include the money he got from Saudi Arabia, which was unstated, he was receiving about $25,000 or so. And yet he could support his family of six in San Diego, support his family of three in Australia, support his son in Kenya, and travel the world at a whim. As the court found out at the detention hearing, he could spend six months in Australia leaving his family here, and the court had real concerns about who Mr. Mohammed was. Who was the person who was working for the county of San Diego as a part-time teacher's assistant getting hundreds of thousands of dollars from these organizations, traveling the world at will? It caused great concern to the court. The court said that in and of itself was enough to take this out of the heartland of cases. The court also considered the fact that he had this other family in Australia, and that he had claimed to be working at this mosque, and it was very unusual how he got to this country. The imam of the mosque testified at the trial and said he was approached by these unknown Somalis, he didn't really remember who they were, he remembered one guy had blue eyes, and that they asked him to sponsor this guy to come into the country and use their legitimate mosque, their tax-exempt status, to say that he was going to come work for you, but he's never worked for you, he worked for us. And the imam said, well that's fine, I agreed to do that because I knew he wouldn't be a burden on the government, he'd be doing work for other people, he wouldn't be on the tax roll, so I really didn't think it was that big a deal. And the court was very concerned about how this person who had come from Somalia to Canada was recruited out of the blue to come to San Diego. The bottom line, Your Honors, is this, I probably should have phrased this a little bit better, it's not whether it's a reasonable sentence, it's whether the sentence is unreasonable. There are many possible reasonable sentences that this court could have imposed, and based on the facts that were elicited at the trial, at the two trials, at the detention hearings, at the motion hearings, the court was faced with this very unusual case and had to make a judgment call as to what was reasonable. And the court said that 18 months was a reasonable sentence. Perhaps Your Honors might think, and if you were sitting there, you would give a little bit less of a sentence or a little bit of a harsher sentence. But like the Manyweather case, the question should be, was it unreasonable? And given all the factors that the court heard, you can't say that it was an unreasonable sentence. The court should affirm the sentence if you're not inclined to find that it's moot, and the appeal should be resolved that way. And I'm happy to answer any questions if the court has any. Other than that, I would thank you for your time. All right. Rebuttal? Your Honor, just briefly, this, in its arguments to the judge, the government argued that the courts would never see a case like this again. And it's true. They never will because they never bring these kind of cases before the courts because they do not have an Omar Muhammad who was living in the United States and took money from an Islamic charity that they shut down. And therefore, they made up their minds somehow at the beginning to get rid of him from this country. And that's why they had the videotape on him right from the very beginning. Furthermore, on the issue of and so that is why not only There is a lot of mystery here, isn't there? There is. On another note, justice, we are going through difficult times. Communities are watching what we do. We need the courts to have an even-handedness when it comes to Muslims who are prosecuted and who are convicted. This is the only way we're going to be winning hearts and minds. If they feel that they're not getting justice within our criminal justice system, then we only exacerbate the problem. And I believe Exacerbate what problem? The problems that we're having between the problems that we're having with Islamic fundamentalism right now. Mr. Muhammad was by no stretch a fundamentalist. He was a preacher. But the fact that he was a Muslim and the fact that he took money from Islamic charity subsequently designated to be tied to terrorism was the fact that brought him into the target of the government. And like I said, even before he went to the interview, they had decided to deport him. But he stayed in there for two years knowing that his sentence was going to be within the guideline range and went through two trials because he wanted to vindicate himself. And he vindicated himself from the terrorism counts, which is count one and two, and the ninth count, which is getting the entry visa by fraud. He vindicated those three counts. Those three counts would have resulted in permanent deportation, and rightfully so. The other counts, the government never brings charges that you lied about your child. They never do, they never will. This is the stuff that they brought in the superseding endowment. When a person is sentenced these days, the guidelines are merely that. They're discretionary. So the judge looks at guidelines and says, OK. And then he goes on and he thinks about these 3553A factors. And then the judge is there to exercise discretion the way it was done in the system before we had the guidelines. And I mean, isn't that about the way it works now? It is, Your Honor. So you know, in the scheme of things in the federal system, 18 months is a very light sentence. But not when the guidelines call for a zero to six month sentence, Judge. No, but the guidelines are just something that they just have to look at. They're not bound by the guidelines. What they're bound by is what the code calls for. What's the maximum that can be imposed here? Five years. OK. So he didn't get five years, he got 18 months. And he didn't and and how long was he in custody? Two years. So you got credit for the 18 months. That's correct. And then that was it. Except that once he sentenced him over that 12 months, he also made him an aggravated felony. So that's a serious consequence too. Well, you know, there's just so many things that are involved here. He has concern for his children here, but he's got another family. So where's he now? He's in Somalia. Somalia, Kenya. He's in Africa. Somalia, Kenya, huh? Does he have a family there too? No, it's my understanding that his Australian partner has joined him there. Oh, in Somalia. That's correct. And to the dismay, I may say, of the U.S. citizen children here who had had high hopes because on the issue of anyway Is there something else you want to add? No, I believe there's a case that the Court it's my understanding that there's a Zavala case that the Court heard on Bank on October 6th that may also address the issue of discretion and reasonableness and what the standard is when these cases come before you. I thought I'd bring that to your attention too. What, that's Zavala, you say? Zavala. 443, Feb. 3, 1165. Zavala and Zavala and Cardi were argued together in Bank and those two cases could affect reasonableness possibly. Okay. You might want to hold that too. Yeah, okay. Thank you, Your Honor. Thank you, Your Honor. Good to see you and appreciate the argument and we'll recess till 9.30 tomorrow morning? 9.30 tomorrow morning. 9.30 tomorrow morning. Now, I guess we'll regroup in conference. Yeah, we'll meet in conference.
judges: Pregerson, Gould, Clifton